UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
:
:                    08 Civ. 6666 (LBS) (KNF)
:
IN RE MILOS LITIGATION          :
:
:
:                    ECF Case
:
:
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

D. Maimon Kirschenbaum          Louis Pechman
Denise A. Schulman              Jessica Tischler
Joseph, Herzfeld, Hester        Berke-Weiss & Pechman LLP
& Kirschenbaum LLP              488 Madison Avenue, 11th Floor
233 Broadway, 5th Floor         New York, NY 10022
New York, NY 10279              (212) 583-9500
(212) 688-5640                  *Attorneys for Plaintiffs*
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL HISTORY ....................................................................................... 2

STATEMENT OF FACTS ........................................................................................ 3

ARGUMENT ............................................................................................................ 3

   THE STATUTORY FRAMEWORK .......................................................................... 3

   1.    The FLSA's Minimum Wage Requirements ..................................................... 3

   2.    The Requirements of NYLL § 196-d ............................................................ 6

   DEFENDANTS VIOLATED THE FLSA AND NYLL BECAUSE MILOS' TIP POOL
   INCLUDED MANAGERS RENO CHRISTOU AND MARIO ZENIOU ............................... 7

      Christou and Zeniou were the leaders of Milos' service team ................................. 8

      Christou and Zeniou had hiring and firing authority ......................................... 10

      Christou and Zeniou supervised service staff ................................................. 11

      Zeniou exercised budgetary responsibilities and had input into employees' pay ................ 14

      Christou and Zeniou were both paid substantially more than minimum wage ..................... 14

   MILOS' TIP POOL UNLAWFULLY INCLUDED A "KITCHEN GUY," STOCKER, AND
   COFFEE MAKER ............................................................................................ 16

      The "Kitchen Guy" .............................................................................. 18

      The Stocker .................................................................................... 19

      The Coffee Person .............................................................................. 19

   OWNER COSTAS SPILIADIS UNLAWFULLY RECEIVED TIPS FROM THE TIP POOL
   ..................................................................................................... 20

   THE FATHER OF MANAGER MARIO ZENIOU UNLAWFULLY RECEIVED TIPS
   FROM THE MILOS TIP POOL ............................................................................ 22

THE STATUTE OF LIMITATIONS FOR DEFENDANTS' FLSA VIOLATIONS IS THREE
YEARS BECAUSE DEFENDANTS' FLSA VIOLATIONS WERE WILLFUL.................. 22

CONCLUSION.......................................................................................................... 23

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs submit this Memorandum of Law in support of their Motion for Partial Summary Judgment.[1]

## PRELIMINARY STATEMENT

Milos restaurant's owner Costas Spiliadis ("Spiliadis") implemented a system whereby tips were diverted from the service staff to individuals who were ineligible to receive those tips. The Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") sharply distinguish between service employees, who may receive tips, and non-service employees or managers, who may not.  Under the FLSA and NYLL, tips left by customers for a restaurant's service staff are the property of the service staff, and an employer may not require service employees to share their tips with tip-ineligible persons.  In blatant contravention of these statutes, Milos utilized customer tips to pay its managers; non-service employees including a "kitchen guy," coffee maker, kitchen stocker; a phantom employee; and owner Spiliadis himself.

In essence, customer tips which belonged to the Milos service staff have been taken by Milos to subsidize its own payroll and to be used as its own ATM.  Because of these unlawful acts, the service staff at Milos is entitled to disgorgement of the tips illegally taken by the restaurant as well as invalidation of the tip credit that Milos took pursuant to Section 203(m) of the FLSA.

---

[1] With this memorandum of law, plaintiffs submit the March 15, 2011 Declaration of D. Maimon Kirschenbaum ("Kirschenbaum Decl.") and exhibits thereto.  All references herein to "[Name] Dep., T._," are to the deposition testimony of witnesses in this case, which are attached as the following exhibits to the Kirschenbaum Decl.: Kirschenbaum Ex. 1, April 15, 2010 deposition of Costas Spiliadis; Kirschenbaum Ex. 16, June 25, 2010 deposition of Maria Arguelles; Kirschenbaum Ex. 24, July 19, 2010 deposition of Mario Zeniou; Kirschenbaum Ex. 32, December 23, 2010 deposition of David Dangoor; Kirschenbaum Ex. 40, December 14, 2010 deposition of Nikolaos Tsikitas; Kirschenbaum Ex. 41, August 18, 2010 deposition of Noumeir Bermeo; Kirschenbaum Ex. 41, August 20, 2010 deposition of Jose Onofre.  All references herein to "Kirschenbaum Ex. [Number]" are to documents attached as exhibits to the Kirschenbaum Decl.

## PROCEDURAL HISTORY

The first Complaint in this case was filed on July 28, 2008, and docketed as Case No. 08 Civ. 6666.  On November 17, 2008 Judge Sand ordered consolidation of this case with Case No. 08 Civ. 6973, which was filed on August 5, 2008 and contained similar allegations of FLSA and NYLL violations against Milos.  A Consolidated Amended Complaint was accepted for filing on November 17, 2008.

On November 18, 2009, plaintiffs' motion to certify the case as a collective action under 216(b) of the FLSA and as a class action under Rule 23 was granted by Judge Sand.   The Court certified the class as "captains, waiters, busboys, and bartenders who were employed by Milos at any time between July 28, 2002 and the present for Rule 23 Class, and between July 28, 2005 and present for the FLSA Collective Class."

To date, sixty-one (61) plaintiffs have submitted opt-in forms to be included in the FLSA Collective.  (Kirschenbaum Decl. ¶ 2.)  There are two hundred twenty (220) members of the Rule 23 Class.[2]  (*Id.*)

Plaintiffs now seek partial summary judgment[3] finding that (1) defendants violated the FLSA by improperly taking a tip credit for its service staff, and (2) defendants violated the NYLL by retaining a portion of its service employees' tips and by requiring its service staff to share tips with managers, a "kitchen guy," a stocker, a coffee maker, a phantom employee, and owner Spiliadis.

---

[2] Thirty-six (36) people submitted exclusion request forms and have been excluded from the Rule 23 Class. (Kirschenbaum Decl. ¶ 2.)
[3] Plaintiffs also allege that floor managers and wine directors at Milos improperly participated in the tip pool. Plaintiffs do not seek summary judgment on those positions as there are disputed issues of facts.

## STATEMENT OF FACTS

Plaintiffs respectfully refer the Court to their annexed Statement of Undisputed Facts pursuant to Local Civil Rule 56.1.

## ARGUMENT

Summary judgment is warranted in this case because "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Indeed, here, the undisputed facts are derived from the testimony of defendants themselves at deposition and from their business records produced in response to plaintiffs' discovery requests. As recently noted by this Court:

> To show the existence of a genuine issue, the nonmoving party must have more than a scintilla of evidence to support its position. 'The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'

*Summit Props. Int'l, LLC v. LPGA*, No. 07 Civ. 58444, 2010 U.S. Dist. LEXIS 58444, at *4-5 (S.D.N.Y. Dec. 6, 2010) (Sand, J.) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)) (internal citation omitted). Inasmuch as the "version" of events presented in this motion is derived from the testimony, emails, and documentary evidence of defendants' own agents and representatives, summary judgment is warranted.

## THE STATUTORY FRAMEWORK

### 1.    The FLSA's Minimum Wage Requirements

In general, the FLSA requires employers to pay employees a minimum wage, currently $7.25 per hour. 29 U.S.C. § 206. An employer may pay a tipped employee less than the federal minimum wage and take a "tip credit" only if certain requirements are met. Specifically:

3

In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on the date of the enactment of this paragraph; and

(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 6(a)(1).

The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C. § 203(m). Here, Milos paid its service staff a reduced minimum wage and took the FLSA's tip credit, but they did so unlawfully as Milos did not fulfill the pre-conditions under the FLSA for taking a tip credit.

Under the FLSA, an employer may not take a tip credit unless "all tips received by such employee have been retained by the employee." 29 U.S.C. § 203(m). An employer may not avail itself of the FLSA's tip-credit if it retains portions of the employee's tips or if it requires employees to share tips with individuals who do not "customarily and regularly receive tips." 29 U.S.C. § 203(m); *Alejo v. Darna Rest.,* No. 09 Civ. 5436, 2010 U.S. Dist. LEXIS 133613 (S.D.N.Y. Dec. 17, 2010) ("unilateral decision by defendants to give plaintiffs only a portion of customer tips" violated the FLSA). Thus, an employer must pay a tipped employee the full minimum wage if the employer retains any portion of employee's tips or if it requires the

4

employee to share tips with people who are either managerial or not customarily tipped employees.

An employer loses its right to the tip credit if the tip pool includes even a single tip-ineligible person. *Chan v. Triple 8 Palace* ("*Chan I*"), No. 03 Civ. 6048, 2006 U.S. Dist. LEXIS 15780 at *47 (S.D.N.Y. March 30, 2006) (Lynch, J.) (ruling that under the FLSA, "employers are not merely barred from taking the tip credit if *they* share in the tip-pool, but they are barred from taking the tip credit if *any person* who does not 'customarily and regularly receive tips' shares in the tip-pool") (emphasis in original). When an employer improperly uses a tip credit, employees are entitled to recover the difference between the hourly rate they were paid and the federal statutory minimum wage. *See Chan v. Sung Yue Tung Corp.* ("*Chan II*"), No. 03 Civ. 6028, 2007 U.S. Dist. LEXIS 7770, at *53, 69-71 (S.D.N.Y. Feb. 1, 2007) (Lynch, J.).

"Defendants, as the employers, bear the burden of proving that they are entitled to taking tip credits." *Bernal v. Vankar Enter., Inc.*, 579 F. Supp. 2d 804, 808 (W.D. Tex. 2008); *see also Driver v. Apple Illinois, LLC*, 265 F.R.D. 293, 298 (N.D. Ill. 2010) ("the employer bears the burden of proving its entitlement to the tip credit."); *Lewis v. Adams Sys., LLC*, No. H-08-2009, 2008 U.S. Dist. LEXIS 91188, at *8 (S.D. Tex. Nov. 10, 2008) ("The employer bears the burden of proving the validity of an employee tip pool[.]").

**2.      The Requirements of NYLL § 196-d**

Section 196-d of the NYLL provides as follows:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee. This provision shall not apply to the checking of hats, coats or other apparel. Nothing in this subdivision shall be construed as affecting the allowances from the minimum wage for gratuities in the amount determined in accordance with the provisions of article nineteen of this chapter nor as affecting practices in connection with banquets and other special functions where a fixed percentage of the patron's bill is added for gratuities which are distributed to employees, nor to the sharing of tips by a waiter with a busboy or similar employee.

Courts generally interpret this statute to be the mirror image of the FLSA in regard to its prohibition against diversion of service staff tips to managers or non-service employees. *See Chan I*, 2006 U.S. Dist. LEXIS 15780, at *47-50 (applying similar standards under the FLSA and the NYLL with regard to who is eligible to be part of a tip pool).

When an employer violates NYLL § 196-d, employees are entitled to recover all tips wrongfully withheld from them. *Cao v. Wu Liang Ye Lexington Rest., Inc.*, No. 08 Civ. 3725, 2010 U.S. Dist. LEXIS 109373, at *13 (S.D.N.Y. Sept. 30, 2010) (Chin, J.) (requiring employer to return unlawful deductions from tips to employees); *Chan II*, 2007 U.S. Dist. LEXIS 7770, at *53 (same).

## ARGUMENT

## POINT I

## DEFENDANTS VIOLATED THE FLSA AND NYLL BECAUSE MILOS' TIP POOL INCLUDED MANAGERS RENO CHRISTOU AND MARIO ZENIOU

The primary duties of Milos manager Reno Christou ("Christou") and his successor, Mario Zeniou ("Zeniou"), were to lead and supervise the service staff at Milos. Indeed, the transition from Christou to Zeniou was announced by owner Spiliadis with the following January 25, 2004 email from Spiliadis:

> Mario is as of now assuming the duties of
> General Manager - - Leader of Milos New York.
> I hope you will help Mario lead Milos to new levels of excellence
> and success.

(Kirschenbaum Ex. 2.) Accordingly, by Spiliadis' own admission, Christou and Zeniou were employers and agents of Milos and ineligible to participate in the tip pool at Milos.

In *Ayres v. 127 Rest. Corp.*, the court identified four primary factors that it considered in determining that the individual in question was a manager and thus tip-ineligible under the FLSA and NYLL: (1) his authority to terminate and suspend; (2) his authority to supervise wait staff and make hiring decisions; (3) his responsibility for the restaurant's budget, including payroll and food; and (4) his receipt of a fixed salary. 12 F. Supp. 2d 305, 308 (S.D.N.Y. 1998) (Chin, J.). Notably, the *Ayres* court referenced as a relevant standard case law under the National Labor Relations Act, which looks to the individual's authority to "interview job applicants, grant time off, allocate overtime work, transfer employees and recommend wage increases." *Id.* (citing *NLRB v. Big Three Indus. Gas & Equip. Co.*, 579 F.2d 304, 309-310 (5th Cir. 1978)).

In a similar vein, in *Chan II* the court found that an individual was an employer because he had authority to "hire and fire captains, waiters and busboys," and "handled shift

assignments." 2007 U.S. Dist. LEXIS 7770, at *36-37; *see also* NYLL § 2(8-a) (defining a corporation's "agent" as including "a manager, superintendent, foreman, supervisor or any other person employed acting in such capacity"); *Tandoor Rest., Inc. v. Comm'r of Labor*, No. PR-82-85, at 2-3 (Industrial Bd. of App. Dec. 23, 1987) (attached as Kirschenbaum Ex. 61) (a tip pool which included employees "engaging in managerial . . . duties" was illegal under § 196-d); NYDOL Opinion Letter of Sept. 23, 1997 (attached as Kirschenbaum Ex. 62) (recognizing that employees, including "hosts or bartenders," may not be part of a tip pool if they "act as an agent of the employer within the meaning of the statute, *e.g.* by exercising the authority to hire and fire and/or determine the schedules and/or compensation of the employees participating in the tip pool.").

Against this legal framework, the record here unequivocally shows that Milos regarded Christou and Zeniou as general managers in both title and practice, and Christou and Zeniou had authority with respect to all of the *Ayres* factors.

**Christou and Zeniou were the leaders of Milos' service team**

Christou and his successor, Zeniou, have been in the Milos tip pool while functioning as general managers of the restaurant, Christou from roughly February 2003 to January 2004, and Zeniou from roughly January 2004 to present.

Christou and Zeniou were referred to as "General Manager" both in internal communications and in communications to the general public and government agencies. For example:

- Milos referred to Christou as "General Manager" on a February 12, 2004 New York Department of Labor questionnaire. (Kirschenbaum Ex. 3.)

- Christou stated in an affidavit signed September 20, 2005 that he "was the general manager of '*Estiatorio Milos*' in New York." (Kirschenbaum Ex. 47 ¶ 2 (emphasis in original).)

8

- In a January 25, 2004 e-mail, Spiliadis announced, "Mario is as of now assuming the duties of General Manager – Leader of Milos New York." (Kirschenbaum Ex. 2.)

- A "fact sheet" developed by Milos' public relations company identifies Zeniou as "General Manager." (Kirschenbaum Ex. 33.)

- Zeniou sent a June 23, 2005 e-mail to a mailing list informing recipients of a New York Restaurant Week program and identifying himself as "Manager." (Kirschenbaum Ex. 33.)

Spiliadis testified that during their respective tenures, Christou and Zeniou were his "right hand" and were each at the top of Spiliadis' self-proclaimed "French pyramid" system at Milos, exercising ultimate authority over service on the floor. (Spiliadis Dep., T. 27-28, 158-159.) Spiliadis described Christou as "my soul and my guy and my voice," and he referred to Zeniou as his "eyes and ears at the restaurant." (Spiliadis Dep., T. 61, 66.) As a largely absentee owner with restaurants in Montreal, Athens, and now Las Vegas, Spiliadis has always relied significantly on Milos' managerial staff to run the restaurant and provide him with information about the restaurant's operations. In fact, Spiliadis speaks with Zeniou by phone every day about business matters and relies on Zeniou to run the business. (Spiliadis Dep., T. 181; Zeniou Dep., T. 32-33.)

Christou and Zeniou were at the inner core of Milos' management team. (*See* Kirschenbaum Ex. 57.) For example, Zeniou was invited to attend the January 3-4, 2008 Milos Strategic Forum Retreat, along with a select group which included Spiliadis, Spiliadis' two children, and co-owner David Dangoor. (Kirschenbaum Ex. 53.) The general purpose of the Retreat was "to discuss the future of Milos," and a key agenda item was the training and leadership development of Milos' staff (Kirschenbaum Ex. 53; Kirschenbaum Ex. 56.) Christou

9

and Zeniou each had a desk at the management office at Milos, along with access codes to the office and safe (Spiliadis Dep., T. 18-19, 21; Arguelles Dep., T. 134.)

**Christou and Zeniou had hiring and firing authority**

Christou and Zeniou routinely hired employees when they were managers.  In fact, Zeniou testified that he was hired by Christou.  (Zeniou Dep., T. 29.)  Spiliadis knows that Zeniou interviews job applicants and wants him to do so, along with other managers such as Arguelles, Coll, and Alam.  (Spiliadis Dep., T. 42.)  When job applicants inquired about potential openings, they frequently met solely with Christou or Zeniou, who would review their resumes, interview them, and, if appropriate, ask them to return to Milos to begin their brief training session.  (Zeniou Dep., T. 87; Bermeo Dep., T. 17-20; Tsikitas Dep., T. 43 (testifying that he was interviewed by Christou and hired on the spot); Onofre Dep., T. 11-12 (testifying that he was interviewed by Zeniou, who told him to return the next day for training).)

After service employees' initial hire and training, Zeniou plays the deciding role in determining which trainees should stay on as permanent employees.  (Arguelles 203-204; Kirschenbaum Ex. 20 (e-mail from Scuria stating, "Mario hopes to be sure, after five days, who should continue to train and who will not make it"); Kirschenbaum Ex. 21 (e-mail from Scuria stating, "Mario plans to keep only a few of the new waiter trainees").)

Defendants' internal communications contain a treasure trove of examples of Christou's and Zeniou's hiring and firing authority:

- Camille Scuria, Milos' operations manager, told Spiliadis that she placed help wanted ads on a web site "to help Reno [Christou] find some Hostesses" and stated that he was interviewing hostess applicants, indicating his involvement in hiring.  (Kirschenbaum Ex. 57.)

- Scuria referred to Christou's "quest for a new floor manager" and described the type of person Christou was looking for.  (Kirschenbaum Ex. 58.)

- Shortly after Zeniou was promoted to the general manager position, Spiliadis wrote in an e-mail that one of Zeniou's top two priorities was "to find more captains." (Kirschenbaum Ex. 18.)

- E-mail communications between Scuria and Spiliadis repeatedly refer to Zeniou's review of resumes of potential hires. (Kirschenbaum Ex. 19; Kirschenbaum Ex. 59.)

- In a February 4, 2004 email from Scuria to Spiliadis, Scuria reported to Spiliadis that Mario told me that he's placed an ad for waiters in a Greek newspaper, so I'm sure he'll be bringing in more trainees soon." (Kirschenbaum Ex. 22.)

- Scuria noted in her February 9, 2004 email to Spiliadis that at a meeting of the service staff Zeniou "expressed ZERO TOLERANCE for arguments on the floor. Anyone arguing will be immediately dismissed." (Kirschenbaum Ex. 12; Arguelles Dep., T. 71-72.)

- Christou fired an employee named Spiro Parris ("Parris") around October 2003. Spiliadis, understanding that a manager with firing authority could not lawfully participate in a tip pool, sought to conceal this fact from the service staff, writing to Christou and Spiliadis' son, "Reno. It should be Maite or Camile [*sic*] to fire Spiro. . . . not you since you are in the tip pool. You can correct it now by saying that you were acting on Maite's order since she was not there." (Kirschenbaum Ex. 7.)

- Scuria wrote in an email dated November 4, 2003, "I fired two of our waiters, as per Reno's/Carolos' instructions." (Kirschenbaum Ex. 6.)

Accordingly, it is clear that Christou and Zeniou had substantial authority over hiring and firing.

**Christou and Zeniou supervised service staff**

That Christou was the alter ego and protector of owner Spiliadis' interests is evidenced by his November 20, 2002 email to Spiliadis:

> For better or for worse, I think that I need to pay closer attention to all of the management staff to insure that they're comfort level here does not get out of hand. Their roles here, for the most part, are supposed be [sic] areas of which I can not do or areas which time did not allow me. I let them go off in their own directions and I think that it's time that I pull them back in a little more. Do not misunderstand me, the place is not a zoo...it's just a personal

> revelation that this is our home and I'm not going to let any of the
> staff FUCK with that.

(Kirschenbaum Ex. 13.)  Christou's email leaves no ambiguity in regard to his role in

supervising Milos' staff.

The mandate of Zeniou, as articulated in owner Spiliadis' February 1, 2004 email to

Scuria, was similarly clear:

> Mario is the number one person in Milos New York and
> everything has to pass through him and be approved by him.

(Kirschenbaum Ex. 18.)  Indeed, it did not take long for other Milos management to take note

that with Zeniou, there was a new sheriff in town.  According to a February 5, 2004 email from

Arguelles to owner Spiliadis:

> After a full week that Mario had taken the helm, the restaurant is
> moving strong with all the changes from training staff down to
> attitude.

(Kirschenbaum Ex. 35.)

Spiliadis has testified that Christou and Zeniou were responsible for "manag[ing] the

service teams."  (Spiliadis Dep., T. 33.)  Christou and Zeniou each ran daily staff meetings

where, as Zeniou explained:

> I usually discuss mistakes and wrong decisions that were made the
>      previous night.  I discuss service issues.  I discuss guests,
> that they are coming in and have their, let's say, more demanding -
> - because everyone is demanding - - more demanding issues on
> service.  I ask to get any feedback from captains, waiters - -
> captains and waiters mostly - - about guests the previous night.  If
> there was any problem, something they didn't like, if we could
> change some thing.  Then I discuss the night that we have ahead of
> us.  Covers, who is coming in specifically.

(Zeniou Dep., T. 58-59; Spiliadis Dep., T. 117.)  At these meetings, they gave instructions and

reminded employees about the restaurant's policies.  (Spiliadis Dep., T. 117.)   Christou also

gave waiter quizzes and drafted Milos' employee handbook. (Arguelles Dep., T. 40, 228-229; Kirschenbaum Ex. 22; Kirschenbaum Ex. 8.) Zeniou directs and instructs service employees on a daily basis, frequently reprimanding and correcting the service staff. (Arguelles Dep., T. 174-175; Zeniou Dep., T. 59.) Zeniou also developed and implemented a five-day waiter training program. (Arguelles Dep., T. 199.)

During their respective tenures as manager, Christou and Zeniou made shift assignments, deciding where and with whom service employees worked during a shift, and whether employees could swap shifts. (Arguelles Dep., T. 105-107; Kirschenbaum Ex. 15.) Zeniou prepares weekly schedules for the service staff and approves or rejects vacation requests. (Zeniou Dep., T. 38; Arguelles Dep., T. 241.) Zeniou has independent authority to grant requests from service staff to take a shift off, and he sends employees home when the restaurant is slow. (Zeniou Dep., T. 55-56; Spiliadis Dep., T. 181.) In sum, Christou and Zeniou held leadership roles at Milos, supervising, scheduling, training, and disciplining the service staff. In fact, Zeniou sees himself as a "good leader" and a "strong leader" of the waitstaff who immediately corrects the service team when mistakes were made:

> Q.   In other words, if somebody does something wrong, you will tell that person immediately that they have done something wrong and how to fix it, correct?
>
> A.   I will address it right away, correct.
>
> Q.   And you will tell them how to correct it; that's your job?
>
> A.   Correct. I will guide them how to improve service.

(Zeniou Dep., T. 168.)

**Zeniou exercised budgetary responsibilities and had input into employees' pay**

Zeniou has independently made decisions involving significant financial expenditures:

- Spiliadis gave Zeniou (and Arguelles) authority to "propose a very high price" for a group that was planning an event at Milos. (Kirschenbaum Ex. 38.)

- In an email from Spiliadis to Dangoor dated February 9, 2005, Spiliadis told Dangoor that "Mario is trying to order" a tea pot for herbal teas. (Kirschenbaum Ex. 45.)

- Zeniou had authority to direct the purchase of $11,664.61 in new plates. (Kirschenbaum Ex. 39.)

- Zeniou visited a flower shop with Scuria looking for Valentine's Day deals. (Kirschenbaum Ex. 12; Arguelles Dep., T. 20.)

- In a January 17, 2007 email from Dangoor to Spiliadis, Dangoor stated that he "encouraged Eric [Executive Director of the Alaska Marine Conservation Council] to speak with Mario and who ever Mario wants with him. I think Mario will see all the benefits very quickly." Dangoor told Spiliadis that, "It is important that Mario spells out what Milos ideally would like from the relationship." (Kirschenbaum Ex. 49)

- In a June 1, 2007 e-mail, Spiliadis told Dangoor, "I will ask Mario to visit your butcher and see if we can work together." (Kirschenbaum Ex. 52)

Zeniou has also had input into employees' pay. In a March 2, 2004 e-mail to Spiliadis, Scuria wrote that the issue of the retroactivity of her pay raise "is to be negotiated by Mario." (Kirschenbaum Ex. 58.)

Moreover, Christou and Zeniou had principal responsibility for reservations at Milos during their tenures as managers, determining how many reservations the restaurant would accept. (Kirschenbaum Ex. 36; Zeniou Dep., T. 76-77.)

**Christou and Zeniou were both paid substantially more than minimum wage**

Both Christou and Zeniou were paid substantially more than the tipped minimum wage paid to Milos' service employees. Defendants' payroll records show that when Christou was in the tip pool, he was paid a high hourly rate that ranged from $8 per hour to $18 per hour at

14

different points.  (Kirschenbaum Ex. 60.)  However, it appears that the hourly rate was used to hide the fact that Christou was in fact being paid a salary, as his hourly rate was adjusted as the amount of tips he received changed in order for him to receive roughly $1923 per week as total compensation.  In fact, in 35 out of 50 weeks during which Christou received tips, his total compensation was between $1920 and $1925.  (*Id.*)  Similarly, he was paid $1900 per week for vacation time.  (*Id.* at D 30403.)

Arguelles testified that Zeniou is paid $500 per week plus tips, regardless of the hours he works.  (Arguelles Dep., T. 57.)  Accordingly Christou and Zeniou were clearly salaried workers, unlike the Class Members they managed who were paid the tipped minimum wage.

The undisputed facts set forth above establish that while Christou and Zeniou were in the tip pool at Milos, they hired, fired, and supervised employees.  They also displayed additional indicia of being managers, such as being paid salaries, working in the restaurant's office, and being considered part of the restaurant's management team. Finally, it bears noting that the fact that Christou and Zeniou were involved in direct customer service does **not** change the analysis. *Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002) (finding it illegal under the FLSA to require employees to share tips with managers "whether or not the members of management were engaged in restaurant services that could be the subject of tipping"); *Chan I*, 2006 U.S. Dist. LEXIS 15780, at *59 (finding that employees who qualify as "employers" under NYLL may not be part of the tip-pool regardless of whether they also performed some service duties).  Moreover, to the extent that Christou and Zeniou did greet and seat customers, they received "handshake tips" for this personal service but did not contribute their tips to the tip pool.  (Zeniou Dep., T. 77, 80.)

15

For the reasons set forth above, plaintiffs are entitled to summary judgment finding defendants liable for plaintiffs' FLSA and NYLL § 196-d claims for the periods that Christou and Zeniou were in the tip pool.

## POINT II

### MILOS' TIP POOL UNLAWFULLY INCLUDED
### A "KITCHEN GUY," STOCKER, AND COFFEE MAKER

Defendants also violated the FLSA and NYLL § 196-d because the tip pool included non-service employees. Under the FLSA, employees who do not "customarily and regularly receive tips" are prohibited from sharing in a tip-pool if the employer pays tipped employees pursuant to a tip credit. *See* 29 U.S.C. § 203(m); *Young v. Sea Horse Venture IV, LLC*, No. 3:07-CV-1818-M, 2009 U.S. Dist. LEXIS 56957, at *2 (N.D. Tex. Feb. 9, 2009) ("Defendant violated 29 U.S.C. § 203(m) by requiring plaintiffs to share their tips with employees engaged in occupations that do not customarily and regularly receive tips, such as kitchen helpers"). Similarly, under NYLL § 196-d, an employer may not require tipped employees to share tips with people other than "busboy[s] or similar employee[s,]" regardless of whether the employer uses a tip credit.

An employee must "perform[] important customer service functions" to be considered an employee who "customarily and regularly" receives tips. *Wajcman v. Inv. Corp. of Palm Beach*, No. 07 80912 CV, 2008 U.S. Dist. LEXIS 21939, at *7-8 (S.D. Fla. Mar. 20, 2008); *see also Ash v. Sambodromo*, 676 F. Supp. 2d 1360, 1371 (S.D. Fla. Nov. 17, 2009) ("Courts have focused on the amount of customer interaction in determining who is a tipped employee [who customarily and regularly receives tips.]"). Similarly § 196-d's limitation, "busboy or similar employee," bars a restaurant from distributing gratuity to employees whose job does not involve a "meaningful aspect of direct service" to customers. *Tandoor Rest., Inc.*, No. PR-82-85, at 3; *see also* N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.14 (2011) (stating that tip "[e]ligible

16

employees must perform, or assist in performing, personal service to patrons at a level that is a principal and regular part of their duties and is not merely occasional or incidental" and listing examples of tip-eligible occupations); *Chan I*, 2006 U.S. Dist. LEXIS 15780, at *57 (recognizing that a tip-pool may not include individuals who, "were not waiters, busboys, or 'similar employees'").

   Moreover, an employee is not tip eligible if he "abstain[s] from any direct intercourse with diners, work[s] entirely outside the view of restaurant patrons, and solely perform[s] duties traditionally classified as food preparation or kitchen support work." *Myers v. Copper Cellar Corp.,* 192 F.3d 546, 550-551 (6th Cir. 1999). "[T]he level of customer interaction is highly relevant to the question of whether an employee may participate in a valid tip pool." *Roussell v. Brinker Int'l, Inc.*, H-05-3733, 2008 U.S. Dist. LEXIS, at *44-45 (S.D. Tex. July 9, 2009).

   In applying these restrictions, courts have consistently held that individuals who do not have meaningful customer interaction and/or do not perform their duties in the view of customers are not tip eligible under the FLSA and/or NYLL. *See*, e.g., *Myers*, 192 F.3d at 550-551 (finding salad preparers who performed their duties outside of the customers' view were not tip eligible); *Pedigo v. Austin Rumba, Inc.*, No. A-08-CA-803-JRN, 2010 U.S. Dist. LEXIS 78251, at *50 (W.D. Tex. June 17, 2010) (granting summary judgment for plaintiffs where tipped employees were required to share tips with dishwashers that had no customer interaction); *Allsopp v. Akiyama, Inc.*, No. 09-cv-00063-WYD-KMT, 2010 U.S. Dist. LEXIS 127060, at *14 (D. Colo. Mar. 26, 2010) (recognizing that a restaurant may not "divert[] servers tips to 'back of the house' employees such as kitchen workers"); *Young v. Sea Horse Venture IV, LLC*, No. 07 CV 1818, 2009 U.S. Dist. LEXIS 56957, at *2 (N.D. Tex. Feb. 9, 2009) (finding that  defendants violated the FLSA by having "kitchen helpers" receive a portion of service employees' tips); *Roussell*,

2008 U.S. Dist. LEXIS 52568, at *44-45 (denying employer's motion for summary judgment because question of fact remained as to whether "QA" employee whose primary job was to make sure food orders were prepared and garnished correctly and delivered to the guest at the right temperature had *de minimis* contact with customer); *Lu v. Jing Fong Rest., Inc.*, 503 F. Supp. 2d 706, 711 (S.D.N.Y. 2007) (noting that under § 196-d dishwashers may not participate in a tip pool because they do not provide direct customer service); *Elkins v. Showcase, Inc.*, 749 P.2d 977, 989 (Kan. 1985) (holding that "non-service bartenders" were not eligible to participate in a mandatory tip pool because they "were located behind a wall so they did not have any contact with customers and were not in a position to receive tips"); *see also* N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.14 (2011); *Tandoor Rest., Inc.*, No. PR-82-85 (finding that kitchen workers including expediters and dishwashers provided no customer service and could not lawfully be part of the tip-pool); NYDOL Tip Guidelines, at 2 (Sept. 3, 1972) (attached as Kirschenbaum Ex. 63) ("We will consider a 'similar employee' to be any employee who participates with the waiter in rendering some personal service to the patron – e.g. the hostess or captain, who greets and seats the patron.  We also will permit tip sharing with a short order cook at a counter – but not with a chef, dishwasher, or other non-service employee who renders no direct service to the public.").

　　　　Against this well settled legal landscape, it is clear that the tip pool at Milos unlawfully included three types of employees who did not provide any direct customer service and were thus tip-ineligible: a "kitchen guy," a "stocker," and a coffee maker.

**The "Kitchen Guy"**

　　　　Milos has a designated "kitchen guy" whose sole duty is to scrape food off dishes before the dishes are put in the dishwasher. (Arguelles Dep., T. 109, Zeniou Dep., T. 129-132.)  The

kitchen guy stands three or four feet away from the dishwasher, out of view of the customers, and:

> Q.    Just so we're clear, the kitchen guy does not go out on the floor for service, correct?
>
> A.    No more.

(Arguelles Dep., T. 109, 112)

Accordingly, the kitchen guy provides no direct customer service and has never been eligible to receive tips under 29 U.S.C. § 203(m) or NYLL § 196-d. *See Kilgore*, 160 F.3d at 301 (contrasting tip-eligible hosts with dishwashers who are not tip-eligible because they "do not directly relate with customers at all").

**The Stocker**

Milos' "stocker" is responsible for drying silverware, stocking dishes, and polishing wine glasses and utensils. The stocker works near the coffee station, does not go into the dining room during his shift, and he has no direct interaction with customers. (Spiliadis Dep., T. 140; Zeniou Dep., T. 127.) Because the stocker does not perform any direct customer service, his inclusion in the tip pool was illegal under 29 U.S.C. § 203(m) and NYLL § 196-d. *See Myers*, 192 F.3d at 550-51 (finding that salad preparers who did not interact with customers and performed their duties outside of the customers view were not tip eligible).

**The Coffee Person**

As many as 350 cups of coffee and tea are served nightly at Milos. (Arguelles Dep., T. 19; Zeniou Dep., T. 122-123.) Coffee and tea are prepared by a dedicated coffee person who works at a coffee station that is outside the view of diners and rarely leaves the coffee station while working. (Spiliadis Dep., T. 124-25, 126, 131; Zeniou Dep. 124.) Thus, the time the coffee person spends on the floor is *de minimis*. This lack of customer interaction renders the

coffee maker tip-ineligible, and defendants have violated the FLSA and NYLL by giving the coffee person points from the tip pool. *See Lu*, 503 F. Supp. 2d at 711 (finding relevant question under FLSA to be whether employee in question had "more than de minimis interaction with the customers").

Here, plaintiffs are entitled to summary judgment on their FLSA claims because defendants have included *three* positions –kitchen guy, stocker, and coffee maker – who, the undisputed facts show, do not interact with customers. For the same reason, plaintiffs are entitled to summary judgment on their NYLL § 196-d claims with respect to the kitchen guy, stocker, and coffee maker.

## POINT III

### OWNER COSTAS SPILIADIS UNLAWFULLY
### RECEIVED TIPS FROM THE TIP POOL

Both NYLL § 196-d and 29 U.S.C. § 203(m) expressly prohibit an employer from retaining its employees' tips. 29 U.S.C. § 203(m) (an employer may not use a tip credit unless "all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips"); NYLL § 196-d ("No employer . . . shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee"). In violation of these statutes, a portion of the cash tips from the tip pool at Milos were placed in an envelope and kept "by the house." (Arguelles Dep., T. 79.)

Specifically, defendants operated a scheme whereby cash tips from the tip pool which were purported to be for Michael Coll, defendants' wine director, were diverted to Spiliadis, the restaurant's owner. These cash tips were put in an envelope and stored in a safe in Milos'

management office for a few months until they were ultimately given to Spiliadis.  Bookkeeper

Arguelles described the system as follows:

> Q.    How about in terms of Michael Coll, did you ever receive   envelopes of cash for Michael Coll?
>
> A.    Yes.
>
> Q.    Did you give those to Michael Coll, or is that money kept by the    house?
>
> A.    Well, that money was kept by the house.
>
> Q.    So tell us how that happens.
>
> A.    That's basically what the instruction was by Costas Spiliadis to me.
>
> Q.    Describe what that system was.
>
> A.    Well, like instead of giving those cash tips to that person, it goes to an envelope and was given to me.
>
> Q.    And what do you do with that cash envelope?
>
> A.    I have it in the office, and I give it to Mr. Spiliadis.
>
> Q.    You give Mr. Spiliadis the cash?
>
> A.    Yes, the envelopes, yes.

(Arguelles Dep., T. 79-87.)

This is a textbook case of an employer retaining tips.  As a result, plaintiffs are entitled to

summary judgment finding that (1) defendants were not eligible to use the FLSA tip credit for

the period of time that defendants retained these cash tips and (2) defendants violated NYLL §

196-d by retaining those tips.  *See Chan II*, 2007 U.S. Dist. LEXIS 7770, at *48-49 (finding that

defendants-employers violated FLSA by retaining a portion of employees' tips); *Lanzetta v.

Florio's Enters.*, No. 08 Civ. 6181, 2011 U.S. Dist. LEXIS 7048, at *13 (S.D.N.Y. Jan. 25,

21

2011) (Chin, J.) (finding that defendants-employers violated NYLL § 196-d by retaining a portion of server's tips).

## POINT IV

### THE FATHER OF MANAGER MARIO ZENIOU UNLAWFULLY RECEIVED TIPS FROM THE MILOS TIP POOL

Defendants' tip pool unlawfully included Mario Zeniou's father, Andreas, a non-employee.  Tips from the tip pool were diverted to Andreas Zeniou, even though Andreas did not work at Milos.  (Arguelles Dep., T. 91; Dangoor Dep., T. 121-122; Kirschenbaum Ex. 17.) Since Andreas Zeniou never worked at Milos, his receipt of tips from the Milos tip pool was illegal under both the FLSA and NYLL.  29 U.S.C. § 203(m) (permitting tip pooling only among "*employees* who customarily and regularly receive tips") (emphasis added); NYLL § 196-d (permitting the sharing of tips "with a busboy or similar *employee*" only).

## POINT V

### THE STATUTE OF LIMITATIONS FOR DEFENDANTS' FLSA VIOLATIONS IS THREE YEARS BECAUSE DEFENDANTS' FLSA VIOLATIONS WERE WILLFUL

The appropriate statute of limitations in this case is three years because defendants' FLSA violations were willful.  29 U.S.C. § 255(a) (setting three year statute of limitations for willful violations and two year statute of limitations for all other violations).  A violation is willful where the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the" FLSA.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  "Reckless disregard of the requirements of the [FLSA] means failure to make adequate inquiry into whether conduct is in compliance with the [FLSA]."  5 C.F.R. § 551.104.  Here, the undisputed evidence shows that defendants' FLSA violations were willful.

Defendants have admitted that since at least 2000 they knew it was illegal to include managers with hiring and firing authority in the tip pool.  (Arguelles Dep., T. 51; *see also* Spiliadis Dep., T. 146.)  Their knowledge that they were breaking the law is also evident in their attempt to cover up Christou's termination of Parris, when Spiliadis stated, "It should be Maite or Camile to fire Spiro. . . . not you since you are in the tip pool.  You can correct it now by saying that you were acting on Maite's order since she was not there."  (Kirschenbaum Ex. 7.)  Despite defendants' documented knowledge that managers could not lawfully be included in the tip pool, Zeniou, who the undisputed facts show was a manager, was in Milos' tip pool throughout the FLSA statute of limitations period.  Therefore, defendants' FLSA violations were willful, and the three-year statute of limitations period applies.

## CONCLUSION

For the foregoing reasons, plaintiffs are entitled to summary judgment finding that (1) defendants violated the FLSA and NYLL § 196-d by including Christou, Zeniou, the kitchen guy, the stocker, the coffee maker, and Andreas Zeniou in the tip pool; (2) defendants violated the FLSA and NYLL § 196-d by diverting cash tips to owner Spiliadis; and (3) a three-year statute of limitations applies to plaintiffs' FLSA claims.

Dated:   New York, New York
           March 15, 2011

JOSEPH, HERZFELD, HESTER &      BERKE-WEISS & PECHMAN LLP
KIRSCHEBAUM LLP


By: /s/ D. Maimon Kirschenbaum     By: /s/ Louis Pechman
    D. Maimon Kirschenbaum, Esq.     Louis Pechman, Esq.
    Denise A. Schulman, Esq.        Jessica Tischler, Esq.
    233 Broadway, 5th Floor         488 Madison Avenue, 11th Floor
    New York, New York 10279       New York, New York 10022
    (212) 688-5640               (212) 583-9500
    *Attorneys for Plaintiffs*        *Attorneys for Plaintiffs*


To: Leonard Wagman, Esq.
    Snow Becker Krauss, P.C.
    605 Third Avenue, 25th Floor
    New York, New York 10158
    (212) 687-3860
    *Attorneys for Defendants*

    Evangelos Michailidis, Esq.
    Duane Morris LLP
    1540 Broadway
    New York, New York 10036
    (212) 471-1864
    *Attorneys for Defendants*