D. Maimon Kirschenbaum, Esq.
Denise A. Schulman, Esq.
Joseph, Herzfeld, Hester LLP
& Kirschenbaum LLP
233 Broadway, 5th Floor
New York, NY 10279
(212) 688-5640
*Attorneys for Plaintiffs*

Louis Pechman, Esq.
Jessica Tischler, Esq.
Berke-Weiss & Pechman LLP
488 Madison Avenue, 11th Floor
New York, NY 10022
(212) 583-9500
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                   :

                                   :    **08 Civ. 6666 (LBS) (KNF)**

                                   :

**IN RE MILOS LITIGATION**        :    **PLAINTIFFS' STATEMENT OF**

                                   :    **UNDISPUTED MATERIAL FACTS**

                                   :

                                   :    **ECF Case**

-----------------------------------------------------------x

        Plaintiffs submit this Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 of the Local Rules for the Southern District of New York, in support of their Motion for Partial Summary Judgment to dismiss the claims of defendants.

<b>STATEMENT OF UNDISPUTED MATERIAL FACTS[1]</b>

**Milos Restaurant**

        1.      Milos is a Greek seafood restaurant located at 125 West 55th Street, New York, New York, 10019 ("Milos").  *See* http://www.milos.ca/en/newyork/index.html.

        2.      There are 160 seats at Milos.  (Spiliadis Dep., T. 133.)

---

[1] With this statement of undisputed material facts, plaintiffs submit the March 15, 2011 Declaration of D. Maimon Kirschenbaum ("Kirschenbaum Decl.") and exhibits thereto.  All references herein to "[Name] Dep., T._," are to the deposition testimony of witnesses in this case, which are attached as the following exhibits to the Kirschenbaum Decl.: Kirschenbaum Ex. 1, April 15, 2010 deposition of Costas Spiliadis; Kirschenbaum Ex. 16, June 25, 2010 deposition of Maria Arguelles; Kirschenbaum Ex. 24, July 19, 2010 deposition of Mario Zeniou; Kirschenbaum Ex. 32, December 23, 2010 deposition of David Dangoor; Kirschenbaum Ex. 40, December 14, 2010 deposition of Nikolaos Tsikitas; Kirschenbaum Ex. 41, August 18, 2010 deposition of Noumeir Bermeo; Kirschenbaum Ex. 41, August 20, 2010 deposition of Jose Onofre.  All references herein to "Kirschenbaum Ex. [Number]" are to documents attached as exhibits to the Kirschenbaum Decl.

**Ownership of Milos**

3.      Costas Spiliadis ("Spiliadis") has an 80% ownership interest in Milos.  (Spiliadis Dep., T. 13.)

4.      David Dangoor ("Dangoor") has a 20% ownership interest in Milos.  (Spiliadis Dep., T. 13.)

5.      Spiliadis also owns restaurants in Athens and Montreal (Spiliadis Dep., T. 13), and he spends most of the year in Greece.  (Dangoor Dep., T. 34.)

**Service Employee Compensation**

6.      Throughout the time period covered by this lawsuit, Milos has paid service employees, *i.e.*, captains, waiters, busboys, and bartenders, an hourly wage that is less than the federal and state minimum wages.  (Spiliadis Dep., T. 115.)

7.      In addition to their hourly wage, service employees receive tips.  (Spiliadis Dep., T. 37, 143.)

8.      All tips left by Milos customers go into a tip pool.  (Spiliadis Dep., T. 37.)

9.      The tip pool is distributed using a point system in which each position is assigned a certain number of points and employees receive a proportional share of the total tip pool based on the number of points they have.   (Kirschenbaum Ex. 14.)

10.     The following positions have been included in the tip pool: "maitre d'," captain, wine director/sommelier, assistant sommelier, waiter, busboy, stocker, coffee person, bartender, and "kitchen guy."  (Kirschenbaum Ex. 14; Zeniou Dep., T. 100-104.)

**Christou and Zeniou Led the Service Team at Milos**

11.     The "service structure" of Milos is what Spiliadis termed "the French pyramid" with Reno Christou ("Christou") (and then, Marios Zeniou ("Zeniou")) at the "top of the

pyramid" or the "head of the pyramid," and each serving as the "leader of the pyramid." (Spiliadis Dep., T. 27, 33, 50, 77, 99; Arguelles Dep., T. 95.)

12.     The structure of the "French pyramid system" at Milos was Christou or Zeniou at the top, captains below them, waiters below the captains, and busboys below the waiters. (Spiliadis Dep., T. 27-28.)

13.     When Christou and Zeniou were at the "top of the pyramid," they were included in and received tips from the tip pool and were referred to for tip pool purposes as the "maitre d'."  (Spiliadis Dep., T. 49-50; Arguelles Dep., T. 142.)

14.     During their respective tenures, Zeniou and Christou were each the "right hand" of Spiliadis.  (Spiliadis Dep., T. 158-159.)

15.     According to Spiliadis, the roles of Christou and Zeniou were "essentially the same." (Spiliadis Dep., T. 157-158; *see also* Zeniou Dep., T. 16 (the positions of Zeniou and Christou were "identical").)

16.     According to Milos bookkeeper Maite Arguelles ("Arguelles"), Christou "from 1999 or 2000 to early part of 2003 was the general manager." (Arguelles Dep.,   T.  141; *see also* Arguelles Dep., T. 31, 46.)

17.     In a biography prepared by Teuwen One Image (Milos' public relations firm), Christou was referred to as the "General Manager."  (Kirschenbaum Ex. 34.)

18.     On February 12, 2004, Christou was referred to as the "General Manager" of Milos on a Department of Labor questionnaire filled out by Camille Scuria ("Scuria"), Milos' Operations Manager, concerning Theodoros Maichosis' claim for unemployment insurance. (Kirschenbaum Ex. 3.)

19.     Christou submitted an affidavit signed and dated September 20, 2005 before a notary, in the lawsuit captioned *In the Matter of the Application of Milos, Inc. For Judicial Dissolution Pursuant to § 1102*, Index No. 111093/2005, in which he stated that he "was the general manager of 'Estiatorio Milos' in New York." (Kirschenbaum Ex. 49.)

20.     On January 25, 2004, weeks after Zeniou replaced Christou, Spiliadis e-mailed Scuria the following message indicating Zeniou's new leadership role:

> Mario is as of now assuming the duties of
> General Manager - - Leader of Milos New York.
> I hope you will help Mario lead Milos to new levels of excellence
> and success.

(Kirschenbaum Ex. 2.)

21.     Zeniou was identified in public relations materials prepared by Teuwen One Image, as the "General Manager" of Milos. (Kirschenbaum Ex. 33.)

22.     In an August 5, 2004 article in *City Magazine*, Zeniou was referred to as "Milos manager Mario Zeniou." (Kirschenbaum Ex. 26.)

23.     In an article entitled "Authentically Greek" by Jerry Shriver, published on August 5, 2004 in *USA Today*, Zeniou is quoted and referenced as "Milos Manager." (*See* Kirschenbam Ex. 25 (also available at http://www.usatoday.com/travel/destinations/2004-08-05-greek-cuisine_x.htm).)

24.     On June 23, 2005, Zeniou sent an e-mail to a mailing list informing recipients of a New York Restaurant Week program and identifying himself as "Manager." (Kirschenbaum Ex. 46.)

25.     Christou and Zeniou each had principal responsibility for reservations at the restaurant during their respective tenure. (Kirschenbaum Ex. 36; Zeniou Dep.,      T. 76-77.)

26.      Christou and Zeniou each had a desk and a computer in the second floor office, "upstairs" from the dining room.  (Zeniou Dep., T. 28; Arguelles Dep., T. 134-36; Spiliadis Dep., T. 18-19.)

**Christou's Responsibilities**

27.      According to Spiliadis, "Reno was my soul and my guy and my voice" and Spiliadis "relied heavily on Reno."  (Spiliadis Dep., T. 67.)  Spiliadis testified, "I love Reno.  He was my boy."  (Spiliadis Dep., T. 67.)

28.      Spiliadis "relied on Reno to manage the service teams."  (Spiliadis Dep.,   T. 33.)

29.      By email dated November 2002, Christou emailed the following message to Spiliadis, who was in Athens, Greece setting up his restaurant Petit Milos:

> For better or for worse, I think that I need to pay closer attention to all of the management staff to insure that they're comfort level here does not get out of hand.  Their roles here, for the most part, are supposed be areas of which I can not do or areas which time did not allow me.  I let them go off in their own directions and I think that it's time that I pull them back in a little more.  Do not misunderstand me, the place is not a zoo…it's just a personal revelation that this is our home and I'm not going to let any of the staff FUCK with that.

(Kirschenbaum Ex. 13.)

30.      Christou was responsible for supervising reservations, hostesses, and coat checks. (Spiliadis Dep., T. 108.)

31.      During the period between 2003 and 2004 when he was overseas, Spiliadis was in contact with Christou, Scuria, and Arguelles to remain apprised of Milos New York operations. (Arguelles Dep., T. 35-36.)

32.      By January of 2004, Christou, Scuria and Arguelles formed "the solid core of Milos' New York City operations."  (Arguelles Dep., T. 35; Kirschenbaum Ex. 57.)

33.     Christou decided which employees would work together as well as which station each employee would work at.  (Arguelles Dep., T. 105-107; Kirschenbaum      Ex. 9.)

34.     Christou was responsible for terminating employees.  (Arguelles Dep.,    T. 31.)

35.     On October 2, 2003, Spiliadis e-mailed Christou and his son, George Spiliadis, to discuss Spiro Parris' termination:

> Reno.  It should be Maite or Camile [sic] to fire Spiro…………
> not you since you are in the tip pool.  You can correct it now by
> saying that you were acting on Maite's order since she was not
> there. Let Maite or Camile [sic] deal now with the rest.

(Kirschenbaum Ex. 7.)

36.     Christou emailed Spiliadis on October 11, 2003 to apprise Spiliadis of various issues at the restaurant involving various problems with the Chef, the "idioligy" [sic] of the restaurant, and personnel issues.  Christou stated as follows to Spiliadis:

> Fucking Athos [floor manager] needs to get slapped around.   O
> malakas me psarepse.  He called me for that purpose exactly and I
> was too naïve to realize it.  He called me telling me that he heard
> bad things vis-à-vis the staff status.  All I told him is that WE are
> having difficulty retaining good staff in the light of our
> restructuring and that it is difficult to battle – NOT THE FIRST
> AND SURELY NOT THE LAST.  I understand that even that
> response was too much but I hope you beleive [sic] that even if I
> did want to complaint [sic], Athos will be the last person that I
> would choose to speak to.  You have every right to be annoyed and
> upset.  The last thing that I would like to do is add to your
> disappointment of your NY management.   Anyhow, afta yia
> simera.
>
> Filakia Polla,
>
> Renos

(Kirschenbaum Ex. 13.)

37.     On October 24, 2003 Spiliadis emailed Christou about his assistance and leadership on the following management personnel issues:

Reno.

A.  I simply didn't know anything about Mr. Cravis party and I was annoyed by the fact that people assume that it is not important for me to know.

B.  It is not enough that Carolos is training one team at a time and that he will move to the next when "appropriate," that is in the next life. Carolos has basically FAILED. I gave him one last chance to rectify the situation by next Friday. I don't care how. He can come with his teams early in the morning, he can do it in between, late after work, Saturday morning, Sunday, I don't care how. He has a few days to do what he fucking did not do all this time when the only thing he cared about was his schedule, his schedule his schedule. If by next Friday, I am not informed that there is a very visible difference, he will be terminated. Please make this clear to him and if you need to show him this letter to you, please do.

C.  Did you also speak to John, that he needs to get out of his shell and take charge of his department. It is not enough anymore for anyone to be nice. I had enough of this. I need results. They are getting paid to a job [sic] and that's all.

D.  Did you make clear to Andreas that he simply has to shape up or out. I don't need him to lead, to be a model, to carry the "responsibility of the senior" and bla bla. I just want him to do HIS JOB FOR WHICH HE IS GETTING PAID, to do it properly or go back were he belongs, to the miserable life of Astoria.

E.  Imagine, Reno, how close we were to 27 at the ZAGAT, if we had not lost the point on the service. We were that close to be really up there in the big league. And we fucked it. And we started paying the price. You see how our business is going down, both in terms of sales and num. of people. And don't be deceived by the increase in prices.

F.  I am really worried. I will do anything I can even from a distance to rectify the situation. I am acting UNDER A STATE OF EMERGENCY and I will not tolerate the maniana attitude by anybody. The stakes are too high. I want to believe that you are DIKOS MOU.

G.  I will cc this email to George and Camille because I want them to know my expectations nag bring them in the same state of urgency. We have nothing to hide, I am tired of politics, MILOS is at the eve of really making it big, I am 57 years old, it is my last opportunity and I DON'T WANT TO MISS IT.

With love.
Your mentor.

(Kirschenbaum Ex. 4.)

38.     On November 4, 2003, Scuria e-mailed Spiliadis and George Spiliadis, informing them that she fired two waiters, Emmanuel and Ninel, "per Reno's/Carolos' instructions." (Kirschenbaum Ex. 6.)

39.     In a December 10, 2003 meeting, Christou addressed menu details and food descriptions which were "ultimate fodder for waiter quizzes" and the typical types of topics he would cover during the daily waiter meeting.  (Arguelles Dep., T. 228-229; Kirschenbaum Ex. 22.)

40.     Christou also was responsible for drafting the Milos employee handbook in 2003. (Arguelles Dep., T. 40; Kirschenbaum Ex. 8.)

**Zeniou's Leadership Role at Milos**

41.     According to Spiliadis "Mario is the heart of the restaurant" and "he leads" the restaurant. (Spiliadis Dep., T. 32.)

42.     Spiliadis described Christou as "my soul and my guy and my voice."  (Spiliadis Dep., T. 66.)

43.     Zeniou is the "eyes and ears" of Spiliadis at the restaurant. (Spiliadis, Dep., T. 61.)

44.     On February 1, 2004, Spiliadis emailed Arguelles and George Spiliadis about Zeniou's role at Milos:

> I spoke to Mario and agree to let him keep the points (11) and have a flat salary of 500 per week.  Regarding Herve, he is our wine director as you said and of course he is expect [*sic*] to help with the floor.  **However, Mario is the number one person in Milos New York and everything has to pass through him and be approved by him.**  Whenever Mario feels unsure about something, he understands that he has to consult me. Mario's two top priorities for now, and I discussed this with him, is 1. TO RESTORE A SENSE OF HOSPITALITY AND WELCOMING at the entrance

of the restaurant, and 2. to find more captains.  No other changes for the moment.

(Kirschenbaum Ex. 18 (emphasis added).)

45.     In her February 5, 2004 email to Spiliadis, Arguelles stated as follows:

> After a full week that Mario had taken the helm, the restaurant is moving strong with all the changes from training staff down to attitude.  We had meetings with every department.  Reservations are picking up esp [sic] for the real diners.  Robert is working along side Mario learning what Milos is all about and how it should run.

(Kirschenbaum Ex. 35.)

46.     Spiliadis noted Zeniou's strong leadership of Milos in his February 29, 2004

email to co-owner Dangoor:

> Now Mario takes all the calls and I see a big difference.  Also Mario is taking decisive steps to correct the service.  All of these of course don't mean that your evaluations are not correct.  I just hope that they represent a period that reached the peak in Christmas but with the departure of Reno who had also completely neglected the management of the staff and the service issues, we are now coming back to be strong again.

(Kirschenbaum Ex. 36.)

47.     On March 17, 2005, co-owner Dangoor e-mailed Spiliadis to let him know that

"Mario is in full control and things seem to work like clockwork."  (Kirschenbaum Ex. 10.)

48.     Zeniou was invited by Spiliadis to attend a Milos Strategic Forum Retreat which

was to take place outside of Montreal from January 3 – 4, 2008 to "discuss the future of Milos."

(Kirschenbaum Ex. 53.)

49.     A key agenda item for the Retreat was the training and leadership development of

Milos' staff.  (Kirschenbaum Ex. 54.)

**Zeniou's Responsibilities on the Floor**

50.   Zeniou stated, "I am the service.  I was running the service.  I am running the service."  (Zeniou Dep., T. 142.)

51.   As described by restaurant co-owner Dangoor, Zeniou's role is that of a "Sergeant Major," running the floor, the door and the service.  (Dangoor Dep., T. 74.)

52.   According to Arguelles, "everything" on the floor has to pass through and be approved by Zeniou:

> [I]f there is anything on the floor, it needs to pass Marios. Meaning if it needs discipline, it has to go through him.  If they need to have more busboys or more waiters or more - - anything that concerns the service from, you know, little things to bigger things.  Like, as I said, if you need the captain, it has to pass through him.  I cannot do that thing.  I'm not on the floor.  I don't see them working.  I cannot say oh, this waiter can be a captain.

(Arguelles Dep., T. 171-172; Kirschenbaum Ex. 18.)

53.   On October 30, 2005, Spiliadis emailed Dangoor to let him know that Sol Zuckerman, a business partner of Milos, was going to Milos and talking to customers, and that "Mario got upset and ordered him to sit down or to wear a waiter's uniform and work." (Kirschenbaum Ex. 48.)

54.   Zeniou's duties involve supervising employees.  (Arguelles Dep., T. 197.)

55.   Zeniou's job is to make sure that the service staff does its job:

Q.   Do you have conversations with a busboy or waiter saying, you better shape up, you are not meeting expectations here?  You have had those kinds of conversations, haven't you?

A.   We discuss.  I might go over and say, you know what, I think we didn't do this, we should do that differently.  Yes.

Q.   All I am saying is you have the discussions generally in a group and then you have specific individual criticisms of particular employees as well, correct?

A.    If I feel that someone did wrong, I might go over and say, you know what, you should do it differently the other time, yes.

Q.    That basically is a large portion of your job, making sure that the waiters, the busboys and the captains do their job right, correct?

A.    Yes.

(Zeniou Dep., T. 60; *see also* Kirschenbaum Ex. 12 ("The crackdown on bussers seems effective;

Mario critiques them on the spot ('Why did you put the knife down the way you did?', etc.)."); 

Zeniou Dep., T. 91; Arguelles Dep., T. 202.)

56.    Zeniou determines which busboy is grouped with which waiter and which

captain:

> Not everyone has the same - - they are the same on the floor. Some of us are stronger, some of us are weaker.  So I am trying to match, let's say, a strong Captain for that particular night with maybe a little bit weaker waiter and maybe a little bit better busboy or vice versa.  It's up to the night.

(Zeniou Dep., T. 38-39.)

57.    Zeniou regularly gives directions to the service staff concerning service, such as

that bussers should not carry more than three plates at a time and that there be no thumbs on

plates.  (Arguelles Dep., T. 174; Zeniou Dep., T. 161-162; *see also* Kirschenbaum Ex. 19.)

**Zeniou Disciplining the Service Staff**

58.    Zeniou sees himself as a "good leader" and a "strong leader" of the waitstaff who

immediately corrects the service team when mistakes were made:

Q.    In other words, if somebody does something wrong, you will tell that person immediately that they have done something wrong and how to fix it, correct?

A.    I will address it right away, correct.

Q.    And you will tell them how to correct it; that's your job?

> A.    Correct.  I will guide them how to improve service.

(Zeniou Dep., T. 168.)

59.    Zeniou gave the following example of the types of things that he would yells at the wait staff about:

> I might yell "Why are you guys doing that if we are saying that you have to do it other ways."  I am pointing to what is wrong that we are doing.

(Zeniou Dep., T. 48-49.)

60.    If a waiter or Captain was not attentive, Zeniou would "discuss it more and more in order for us to be more attentive.  What things we should do better."  (Zeniou Dep., T. 34.)

61.    In a February 9, 2004 email to Spiliadis, Scuria described a service staff meeting run by Zeniou:

> Marios expressed "ZERO TOLERANCE" for arguments on the floor.  Anyone arguing will be immediately dismissed.

(Kirschenbaum Ex. 12; Arguelles Dep., T. 71-72.)

**Waiter Training Program**

62.    Zeniou participated in the development of a five-day waiter training program. (Arguelles Dep., T. 199.)

63.    Zeniou can make a determination as to which waiter trainee to keep and which waiter trainee to let go because "he works with them on the floor, and he sees how they work." (Arguelles Dep., T. 203-204.)

64.    On February 4, 2004, Scuria wrote in an e-mail to Spiliadis, "Mario hopes to be sure, after five days, who should continue to train and who will not make it."  (Kirschenbaum Ex. 20.)

12

65.     On February 9, 2004, Scuria e-mailed Spiliadis that "Mario plans to keep only a few of the new waiter trainees." (Kirschenbaum Ex. 21.)

**Scheduling**

66.     Christou and Zeniou filled out the schedule each week. (Spiliadis Dep., T. 122-123.)

67.     If a service employee has an issue with his or her schedule, he or she will seek an accommodation from Zeniou. (Spiliadis Dep., T. 121-122.)

68.     Zeniou has authority to approve the swapping of schedules and the granting of days off to employees. (Spiliadis Dep., T. 181.)

69.     When Christou worked at Milos, the three people that had authority to let employees swap shifts were Arguelles, Christou, and Scuria. (Arguelles Dep., T. 130; Kirschenbaum Ex. 15.)

70.     Zeniou sends employees home when the restaurant is slow. (Zeniou Dep., T. 55-56.)

71.     Zeniou determines the vacation schedule and approves vacation requests for the wait staff, along with Arguelles. (Arguelles Dep., T. 241.)

**Hiring and Firing**

72.     Christou hired employees. (Zeniou Dep., T. 29; Tsikitas Dep., T. 43.)

73.     During their respective tenures, Christou and Zeniou interviewed job applicants and hired them on the spot. (Zeniou Dep., T. 87; Bermeo Dep., T. 17-20; Tsikitas Dep., T. 43; Onofre Dep., T. 11-12.)

74.      In a December 9, 2003 e-mail, Scuria told Spiliadis that she placed help wanted ads on a web site "to help Reno find some Hostesses" and stated that he was interviewing hostess applicants.  (Kirschenbaum Ex. 55.)

75.      In a December 18, 2003 e-mail, Scuria referred to Christou's "quest for a new floor manger" and descried the type of person Christou was looking for.  (Kirschenbaum Ex. 56.)

76.      Christou fired an employee named Spiro Parris around October 2003. (Kirschenbaum Ex. 7.)

77.      In an e-mail dated November 4, 2003, Scuria stated, "I fired two of our waiters, as per Reno's/Carolos' instructions."  (Kirschenbaum Ex. 6.)

78.      Shortly after Zeniou was promoted to the general manager position, Spiliadis wrote in an e-mail that one of Zeniou's top two priorities was "to find more captains." (Kirschenbaum Ex. 18.)

79.      Spiliadis knows that Zeniou interviews job applicants and wants him to do so, along with other managers such as Arguelles, Coll, and Alam.  (Spiliadis Dep.,   T. 42.)

80.      E-mail communications between Scuria and Spiliadis repeatedly refer to Zeniou's review of resumes of potential hires.  (Kirschenbaum Ex. 19; Kirschenbaum  Ex. 59.)

81.      On February 4, 2004, Scuria emailed Spiliadis, Arguelles, and George Spiliadis to provide a summary of restaurant operations for the second half of January 2004.  She discussed Zeniou's involvement with the waiter training and hiring practice:

> Mario hopes to be sure, after five days, who should continue to train and who will not make it.  Mario told me that he's placed an ad for waiters in a Greek newspaper, so I'm sure he'll be bringing in more trainees soon.

(Kirschenbaum Ex. 20.)

82.    In a February 2004 Dining Room Observations Report Scuria sent to Spiliadis, she noted,

> • runner Wilson doesn't know enough about the dishes; crackdown
> on bussers seems effective; Mario critiques them on the spot
> ("Why did you put the knife down the way you did?", etc.)
>
> • Mario plans to keep only a few of the waiter trainees
>
> • Mario addressed meeting: quick table setups; everyone does it.
> Zero tolerance for arguments on floor; immediate dismissal

(Kirschenbaum Ex. 29.)

83.    Zeniou reviews e-mail applications for wait staff positions.  (Zeniou Dep., T. 85.)

84.    Zeniou received resumes for the position of dinner-time hostess.  (Kirschenbaum Ex. 19.)

85.    Zeniou testified as to his key involvement in the hiring process at Milos:

Q.    When a busboy comes to interview at Milos, how do you evaluate whether that busboy is a good candidate for the position?

A.    After I see a resume and review it with Maite, we bring them for training.  The training period is between three to five days.  Throughout that training, then we decide if the busboy or the waiter is qualified to work at Milos.

Q.    How do you evaluate whether a busboy or a waiter is qualified?  What are the factors that you look at?

A.    I see the job that they do within a few days.  I always take the opinion from everyone on the floor that are training them.  They give me feedback.  I discuss it with Maite.  Then we decide that that person is a good candidate for Milos, and then we might bring him back.

(Zeniou Dep., T. 36.)

86.    On August 5, 2004, Scuria e-mailed Spiliadis about candidates for the doorman and porter positions and stated that "Mario hopes to hire people by next week."  (Kirschenbaum Ex. 11.)

15

87.     On October 21, 2007, Spiliadis forwarded to Zeniou by e-mail a resume he received with the following message:

Mario.  Should we give him a chance?  Costas.

(Kirschenbaum Ex. 28.)

**Managers/Staff Meetings**

88.     Christou and Zeniou were responsible for running daily staff meetings at 4:15 p.m. (Spiliadis Dep., T. 117.)

89.     Zeniou was the "leader" of the meetings.  (Spiliadis Dep., T. 153.)

90.     Manager meetings took place "once a week or every two weeks."  (Arguelles Dep., T. 67-68.)

**Issues Zeniou Discussed at Managers/Staff Meetings**

91.     Zeniou described the content of the daily staff meetings:

I usually discuss mistakes and wrong decisions that were made the previous night.  I discuss service issues.  I discuss guests, that they are coming in and have their, let's say, more demanding - - because everyone is demanding - - more demanding issues on service.  I ask to get any feedback from captains, waiters - - captains and waiters mostly - - about guests the previous night.  If there was any problem, something they didn't like, if we could change some thing.  Then I discuss the night that we have ahead of us.  Covers, who is coming in specifically.

(Zeniou Dep., T. 58-59.)

92.   During the daily meetings, Zeniou speaks about mistakes that were made the previous night.  As noted by Zeniou, for example:

> Serve from the left and not from the right.  Bus a table when people are still eating.  Not pour the appropriate olive oil on the plate that we have. Jump in front of the guests instead of letting the guest go first.  You want more examples? Pour wine to a gentleman instead of the lady first.  Don't take the order on time. … These are general mistakes that I address every day.

(Zeniou Dep., T. 58-59.)

93.   At the staff meetings, Zeniou told the staff that they needed to turn the tables around quicker and Zeniou "pressed everyone to help set the tables." (Spiliadis Dep., T. 153; Kirschenbaum Ex. 12.)

94.   Zeniou gives particular instructions to the staff with respect to who is coming in and how tables are assigned.  As noted by Zeniou, for example:

> We might have a table of eight coming in at 6:00, and because the theater is at 7:00, we have to rush the order.  So jump on the table right away, take the order and expedite fast.

(Zeniou Dep., T. 58-59.)

95.   Zeniou "met with the bartenders to discuss impending food inspections and work shifts." (Kirschenbaum Ex. 19.)

96.   Zeniou reminds the waitstaff of the restaurant's policies. (Spiliadis Dep., T. 153-154.)

97.   Zeniou uses the daily service staff meetings to remind the staff "about discipline." Zeniou got "the point across everybody" in terms of reminding the staff about discipline and issues.  (Arguelles Dep., T. 72.)

98.   The issues discussed during the managers meetings included "service, produce, future activities."  (Arguelles Dep., T. 68.)

99.     Discussions concerning employee performance were "included in the service portion" of the managers meetings.  (Arguelles Dep., T. 68.)

**Zeniou's Communication with Spiliadis**

100.    Spiliadis speaks to Zeniou at least once a day:

> to see if [the restaurant] is busy, how we did for the night, if there are any special requests by customers, by parties.  If we had any difficulties with the service, if the food came out good.   If the customers were happy, if the staff were happy.

(Spiliadis Dep., T. 17.)

101.    According to Spiliadis, he has a daily one-hour debriefing every night with Zeniou about what transpired at the restaurant:

> I speak with Mario every night, every night from 11:30 to 12:30, every night when I'm not here, and he will describe to me all the happenings at the restaurant, and he will tell me if he had to give a complementary to anybody and why.

(Spiliadis Dep., T. 113; Zeniou Dep., T. 32-33; *see also* Kirschenbaum Ex.  37("I am in conduct [sic] with Mario every day several times.").)

102.    When there is a problem with the service staff, it is Zeniou who gives Spiliadis the "general picture."  (Spiliadis Dep., T. 18.)

103.    According to Zeniou's testimony, "I always tell Costas what is going on in the restaurant, on the floor."  (Zeniou Dep., T. 32.)

104.    Zeniou "always makes recommendations" to Spiliadis about everything, "including questions about the staff."  (Zeniou Dep., T. 68.)

**Christou's Compensation**

105.    Defendants' payroll records show that when Christou was in the tip pool, he was paid a high hourly rate that ranged from $8 per hour to $18 per hour at different points. (Kirschenbaum Ex. 60.)

106.    Christou's typical total weekly compensation when he was in the tip pool was roughly $1923.  (Kirschenbaum Ex. 60)

107.     In 35 out of 50 weeks during which Christou received tips, his total weekly compensation was between $1920 and $1925.  (Kirschenbaum Ex. 60)

108.    Christou was paid $1900 per week for vacation time.  (Kirschenbaum    Ex. 60 at D30403.)

**Zeniou' Compensation**

109.    Zeniou would have to be paid a salary of around $100,000 a year if he did not receive his share of the tip pool.  (Arguelles Dep., T. 53.)

110.    Arguelles testified that he is paid $500 per week, regardless of the hours that he works.  (Arguelles Dep., T. 57.)

111.    Zeniou is not required to clock in and out like the other members of the service staff.  (Arguelles Dep., T. 53, 57; Zeniou Dep., T. 12.)

112.    Zeniou received $2,200 for one week's vacation pay.  (Arguelles Dep.,     T. 64; Zeniou Dep., T. 145.)

113.    Zeniou receives "two to three" weeks of paid vacations.  (Arguelles Dep., T. 241.)

114.    Arguelles believes that it was as a result of this lawsuit that Zeniou stopped receiving a salary.  (Arguelles Dep., T. 97.)

115.    On January 30, 2004, Arguelles e-mailed Spiliadis and George Spiliadis to discuss plans for Zeniou's compensation when he took over Christou's position:

> The week was a big adjustment for Mario but he handled
> everything well.  My question now is how are we going to pay
> him?  He normally works 6 dinners and 1 or 2 lunches and
> averages 1,800 to 2,000 gross a week (busy nights).
> I don't know how you want to handle this.  Will you give him a
> flat weekly and let him keep his tips?  Please advise.

(Kirschenbaum Ex. 5.)

116.    On February 1, 2004, Spiliadis e-mailed Arguelles and George Spiliadis regarding Zeniou's compensation:

> I spoke to Mario and agree to let him keep the points (11) and have
> a flat salary of 500 per week.

(Kirschenbaum Ex. 18.)

**Other Indicia of Zeniou's Management Role**

117.    In a mass email dated June 23, 2005 sent to "Friends of Milos," Zeniou's signature line listed his title as "Manager."  (Kirschenbaum Ex. 46.)

118.    Zeniou has the access code to the office and has the code to the safe. (Spiliadis Dep., T. 21.)

119.    Zeniou, along with Christou, had business cards. (Kirschenbaum Ex. 27)

120.    Zeniou had authority to send employees home and has actually sent employees home for fighting or for eating in the back during service. (Zeniou Dep., T. 93-94.)

121.    Zeniou has the authority to call the exterminating company when there are bugs in the restaurant or the linen company when there is a problem with the linens.  (Zeniou Dep., T. 147-148; Kirschenbaum Ex. 31.)

122.    On June 21, 2004, Dangoor emailed Spiliadis that he was "checking about the air conditioning. Marios isn't fully satisfied." (Kirschenbaum Ex. 43.)

123.    In an email from Dangoor to Spiliadis on May 9, 2007, Dangoor told Spiliadis, "the odor … I discussed it with Mario and I hope he can address it." (Kirschenbaum Ex. 51.)

124.    On September 24, 2004 in an email from Scuria to Spiliadis in which she discussed linen prices and options, Scuria wrote, "Marios must decide." (Kirschenbaum Ex. 31.)

125.    On November 1, 2004, Spiliadis emailed Dangoor to report Milos' sales for October 2004 and stated:

> WE HIT THE MILLION IN SALES FOR OCTOBER !!!!!!!!!!!!
> It meant a lot to all and especially to Mario and George (my son)
> who conspired and worked hard to achieve this goal.

(Kirschenbaum Ex. 44.)

126.    Spiliadis gave Zeniou (and Arguelles) authority to "propose a very high price" for a group that was planning an event at Milos. (Kirschenbaum Ex. 38.)

127.    In an email from Spiliadis to Dangoor dated February 9, 2005, Spiliadis told Dangoor that "Mario is trying to order" a tea pot for herbal teas. (Kirschenbaum Ex. 45.)

128.    Zeniou had authority to direct the purchase of $11,664.61 in new plates. (Kirschenbaum Ex. 39.)

129.    Zeniou visited the flower shop with Scuria, looking for Valentine's Day deals. (Kirschenbaum Ex. 12; Arguelles Dep., T. 20.)

130.    In a January 17, 2007 email from Dangoor to Spiliadis, Dangoor stated that he encouraged the Executive Director of the Alaska Marine Conservation Council "to speak with Mario and who ever Mario wants with him. I think Mario will see all the benefits very quickly."

Dangoor told Spiliadis that, "It is important that Mario spells out what Milos ideally would like from the relationship." (Kirschenbaum Ex. 49.)

131.    Zeniou also met with a representative of the Alaska Marine Conservation Council in January 2007 to discuss using them as a supplier of seafood. In an email dated January 18, 2007 from Spiliadis to Dangoor, Spiliadis stated:

> David.
> This is really, very exciting!!!!!!!!!!!!!!!!!   Mario met with them.
> He is excited too.  I want to persue [sic] this in a major way.
> Costas

(Kirschenbaum Ex. 50.)

132.    In an email dated June 1, 2007, Spiliadis told Dangoor that, "I will ask Mario to visit your butcher and see if we can work together." (Kirschenbaum Ex. 52.)

133.    Arguelles consulted Zeniou as to his opinion regarding a proposed salary increase for Scuria. (Arguelles Dep., T. 179.)

134.    In a March 2, 2004 e-mail to Spiliadis, Scuria wrote that the issue of the retroactivity of her pay raise "is to be negotiated by Mario." (Kirschenbaum Ex. 58.)

135.    Arguelles asked Zeniou's opinion as to what Scuria was doing and how she was doing her job. (Arguelles Dep., T. 180.)

136.    To the extent that Christou and Zeniou did greet and seat customers, they received "handshake tips" for this personal service but did not contribute their tips to the tip pool. (Zeniou Dep., T. 77, 80.)

**Public Relations and Advertising**

137.    Zeniou placed advertisements in Greek newspapers for waiters. (Arguelles Dep., T. 199.)

138.    Zeniou made television appearances for the restaurant.  (Arguelles Dep., T. 244; Kirschenbaum Ex. 30.)

139.    Zeniou gave comments to the press on behalf of Milos.  (Kirschenbaum Ex. 25.)

**Zeniou's Involvement in Other Milos Locations**

140.    Zeniou met with Spiliadis in Montreal to discuss Milos and "how to improve in our business."  (Zeniou Dep., T. 67-68.)

141.    Zeniou was sent by Spiliadis to Athens in 2005 to train the staff at Milos Athens. (Zeniou Dep., T. 70.)

142.    Zeniou is taking part in the setup of Milos Las Vegas, and has been sent to Las Vegas by Spiliadis.  (Zeniou Dep., T. 70.)

143.    Zeniou "had a conversation with Costas about Milos Miami," discussing "if there's an opening, if Miami is a good market for Milos."  (Zeniou Dep., T. 72.)

**Kitchen Guy**

144.    Milos has a position called "kitchen guy."  (Arguelles Dep., T. 109.)

145.    The principal responsibility of the kitchen guy is to clear up the plates and give those plates to the dishwasher.  (Arguelles Dep., T. 109; Zeniou Dep., T. 129-132 (The responsibilities of the kitchen guy were to "scrape the plates … [a]nd plac[e] the plates, the glassware and the silverware in the appropriate racks").)

146.    The "kitchen guy" stands three or four feet away from the dishwasher. (Arguelles Dep., T. 109.)

147.    Arguelles described the process of clearing the plates:

> This is the dishwashing area.  So there's a two or - - you know, garbage pail there.  Before you hand it in to the dishwasher, the plates that you have taken from the customer's table, you have to clear it up so it doesn't clog the dishwasher.

(Arguelles Dep., T. 109.)

148.    The kitchen guy is not involved with service on the floor:

> Q.    Just so we're clear, the kitchen guy does not go out on the floor for service, correct?
>
> A.    No more.

(Arguelles Dep., T. 112.)

149.    The individual working as the kitchen guy was not a bus boy but rather was a kitchen employee assigned by Chef Alam to perform the plate scraping function.  (Arguelles Dep., T. 113-114, 122-123.)

150.    Until after this lawsuit was filed, the kitchen guy received a portion of the tip pool.  (Kirschenbaum Ex. 14; Arguelles Dep., T. 117-118.)

**Stocker**

151.    Milos has a position called "stocker."  (Spiliadis Dep., T. 136-37.)

152.    The stocker has sole responsibility for drying silverware, stocking the dishes, and making sure that all the wine glasses and utensils are polished.  (Spiliadis Dep., T. 136-37, 139.)

153.    The stocker's role is simply to stock; he "does not go out into the dining room ordinarily during his shift."  (Spiliadis Dep., T. 140.)

154.    As noted by Zeniou, the stocker position is removed from the customer dining area:

> Q.    Where the stocker principally performs his position, what location is that at?

> A.     It's next to the coffee station.
>
> Q.     Do any customers go by where the stocker performs his duties?
>
> A.     No.

(Zeniou Dep., T. 127.)

155.    The stocker has received a portion of the tip pool.  (Plaintiffs' Ex. 16; Zeniou Dep., T. 99-100.)

**Coffee Person**

156.    On an average night, between 150-350 cups of coffee and tea will be served at Milos.  (Arguelles Dep., T. 19; Zeniou Dep., T. 122-123.)

157.    Coffee and tea are prepared by a "coffee maker" who works at a dedicated coffee station.  (Spiliadis Dep., T. 124-25, 126.)

158.    For much of the period of time covered by this lawsuit, the coffee maker has been a woman named Ynez.  (Spiliadis Dep., T. 124-25.)

159.    The coffee maker's job is "making the coffee, prepare them so they're ready to be picked up by the busboys."  (Spiliadis Dep., T. 125.)  Specifically, she is responsible for preparing coffees, espresso, cappuccino, and a variety of teas, which she prepares on trays along with sugar and silverware.  (Spiliadis Dep., T. 127-128; Arguelles Dep., T. 249-250.)

160.    At the coffee station, there is an espresso machine, coffee machine, and Greek coffee machine.  (Spiliadis Dep., T. 126-127.)

161.    There is a computer at the coffee station which prints out coffee orders entered by waitstaff who are on the floor dealing with the customers.  (Spiliadis Dep., T. 129.)

162.    Customers in the dining room cannot see the coffee station.  (Spiliadis Dep., T. 131.)

163.    Customers do not go to the coffee station. (Zeniou Dep., T. 125)

164.    The coffee person remains at the coffee station and only does that job:

Q.    It's fair to say Ynez is great at making the coffee, so she makes    coffee for everyone?

A.    Yes.

Q.    That makes sense rather than have every busboy make their own    coffee?

A.    Yes.

Q.    You have somebody who is reliable, who is fixed at the coffee    station, who does that job a hundred percent of the time that she is   there, correct?

A.    Yes.

(Arguelles Dep., T. 250-251; *see also* Spiliadis Dep., T. 124-25, 126; Zeniou Dep., T. 124.)

**Michael Coll's Cash Tips**

165.    Cash tips from the tip pool that were designated for wine director Michael Coll ("Coll") were taken by Spiliadis:

Q.    How about in terms of Michael Coll, did you ever receive    envelopes of cash for Michael Coll?

A.    Yes.

Q.    Did you give those to Michael Coll, or is that money kept by the    house?

A.    Well, that money was kept by the house.

Q.    So tell us how that happens.

A.    That's basically what the instruction was by Costas Spiliadis to me.

Q.    Describe what that system was.

A.      Well, like instead of giving those cash tips to that person, it goes to an envelope and was given to me.

Q.      And what do you do with that cash envelope?

A.      I have it in the office, and I give it to Mr. Spiliadis.

Q.      You give Mr. Spiliadis the cash?

A.      Yes, the envelopes, yes.

Q.      Is there an accounting of that money that you give to Mr. Spiliadis?

A.      As far as I know, Iouanna has an accounting.  I'm sorry, I don't      know if there's an accounting.

Q.      Just so I'm clear, Michael Coll got a salary from Milos?

A.      Yes.

Q.      And he got to retain the credit card tips?

A.      Yes.

Q.      But the cash tips that would have gone to Michael Coll were given by you to Mr. Spiliadis?

A.      Yes.

(Arguelles Dep., T. 79-81.)

166.    The cash envelopes were bundled up by Arguelles and given to Spiliadis every two or three months.  (Arguelles Dep., T. 79-87.)

167.    Arguelles stored Coll's cash tips in the restaurant's safe for Spiliadis.  (Arguelles Dep., T. 224.)

168.    The cash that Arguelles put in the safe for Spiliadis was originally left by customers as tips for Milos' service staff.  (Arguelles Dep., T. 86.)

169.    Because Coll was considered part of the service staff, he was entitled to part of those cash tips that were left.  (Arguelles Dep., T. 86.)

170.   Those cash tips that were distributed for Coll were in turn passed on from

Arguelles to owner Spiliadis.  (Arguelles Dep., T. 87.)

**Andreas Zeniou**

171.   Tips from the tip pool were diverted to "Andreas Zeniou," Marios Zeniou's

father, even though Andreas does not work at Milos.  (Arguelles Dep., T. 91; Dangoor Dep., T.

121-122; Kirschenbaum Ex. 17.)

**Milos Management Understood that an Individual Who Hires
and Fires Should Not Be in the Tip Pool**

172.   In 2000, the Department of Labor conducted an investigation at Milos.  (Arguelles

Dep., T. 49-50)

173.   As a result of that investigation, Milos knew that it was illegal for a person with

hiring and firing authority to be in the tip pool.  (Arguelles Dep., T. 51, 238.)

174.   When Christou was employed by Milos, Spiliadis knew that a person with hiring

and firing authority could not lawfully be in the tip pool.  (Spiliadis Dep., T. 163.)

175.   Spiliadis was told by his attorney that an individual that has the authority to hire

and fire should not be in the tip pool. (Spiliadis Dep., T. 146.)

176.   Spiliadis sought to cover up Christou's hiring authority after Christou fired Spiro

Parris, stating in an October 2, 2003 e-mail to Christou,

> It should be Maite or Camile [*sic*] to fire Spiro. . . . not you
> [referring to Christou] since you are in the tip pool.  You can
> correct it now by saying that you were acting on Maite's order
> since she was not there.

(Kirschenbaum Ex. 7.)

Dated:   New York, New York
        March 15, 2011

JOSEPH, HERZFELD, HESTER &               BERKE-WEISS & PECHMAN LLP
KIRSCHEBAUM LLP


By: /s/ D. Maimon Kirschenbaum          By: /s/ Louis Pechman
    D. Maimon Kirschenbaum, Esq.              Louis Pechman, Esq.
    Denise A. Schulman, Esq.                  Jessica Tischler, Esq.
    233 Broadway, 5th Floor                   488 Madison Avenue, 11th Floor
    New York, New York 10279                  New York, New York 10022
    (212) 688-5640                            (212) 583-9500
    *Attorneys for Plaintiffs*                *Attorneys for Plaintiffs*


To:  Leonard Wagman, Esq.
    Snow Becker Krauss, P.C.
    605 Third Avenue, 25th Floor
    New York, New York 10158
    (212) 687-3860
    *Attorneys for Defendants*

    Evangelos Michailidis, Esq.
    Duane Morris LLP
    1540 Broadway
    New York, New York 10036
    (212) 471-1864
    *Attorneys for Defendants*